[No. 26193. Department Two. August 31, 1936.]

THOMAS A. E. LALLY, *as Receiver, Respondent,* v. L. D. JOHNSON *et al., Appellants.*[1]

*T. T. Grant,* for appellants.

*Thos. A. E. Lally* and *Funkhouser & Twohy,* for respondent.

BLAKE, J.—These are three actions on promissory notes, upon which defendant L. D. Johnson appeared either as maker or indorser. In all of the actions, he interposed an identic affirmative defense and cross-complaint. The causes were consolidated for trial.

Plaintiff offered the notes in evidence, with proof of

[1] Reported in 60 P. (2d) 249.

execution or indorsement by Johnson, and established the amounts due. Defendant submitted evidence in support of his affirmative defense and cross-complaint. At the close of defendant's evidence, the court sustained challenges to its sufficiency. Findings were made sustaining plaintiff's right to recover on the notes, and judgments were entered for the amounts due. Johnson has appealed. By stipulation, the appeals have been consolidated.

The following is a narration of what seems to us to be the salient facts developed by appellant in support of his affirmative defense and cross-complaint.

For thirty years or more, appellant has been a successful farmer in Whitman county. During the period with which we are concerned, he did his banking with Whitman County National Bank of Rosalia, of which F. J. Wilmer was the managing officer. During the years immediately preceding 1921 (and subsequently), appellant from time to time had large sums of money on deposit with the bank. In 1921, his deposits amounted to fifty or sixty thousand dollars. On many occasions, he and Wilmer discussed the matter of investing these funds. The upshot of these discussions was that, on November 15, 1921, appellant executed and delivered to Wilmer a general power of attorney.

During the next ten years, acting under this power of attorney, Wilmer drew on Johnson's account to the extent of eighty thousand dollars or more. The theory of appellant's defense and cross-complaint is that this money was fraudulently withdrawn by Wilmer, and that much of it went into the coffers of the bank, where it became the subject of a constructive trust. The foundation for this theory rests on the fact that, in a few instances, Wilmer loaned appellant's money to other customers of the bank, who, at about the time

the loans were made, discharged some of their own obligations to the bank.

We think, however, as did the trial court, that these coincidences raised no more than a suspicion that the bank profited by the method in which Wilmer handled and invested appellant's funds. Certainly, the evidence does not follow appellant's money into the coffers of the bank with that degree of certainty necessary to establish a constructive trust.

As pointed out by the trial court, the force and effect of these suspicious instances are lost when we come to consider appellant's evidence as a whole. The great bulk of the withdrawals made by Wilmer clearly went into enterprises in which appellant was an active participant.

About 1919, appellant became interested with one Frantz in the purchase of a section of land. A year or two later, Frantz entered into a contract to purchase another farm. From the time of the purchase of the first farm, appellant, the bank and Wilmer himself poured money into Frantz's farming operations. They literally carried him and his contracts for more than ten years. They bought machinery for his account, erected buildings on his farms, and even paid his life insurance premium. More than $47,000 of the withdrawals by Wilmer from appellant's account went into the support of Frantz's operations. Finally, Frantz became so involved that he deeded the farms to appellant. Yet appellant pleaded ignorance of these withdrawals, and sought to charge the amount against the bank, because in the final settlement Frantz's obligations to the bank were discharged. But appellant got the land.

Again, appellant sought to charge the bank with an amount in excess of $13,000 on account of loans made by Wilmer to Hjalmer Hardware Company. Yet it

appears that appellant was, at one time during the period involved, president of that company. He not only knew of the loans, but bought machinery from the company and charged the purchase price against the loans.

All through the period during which Wilmer was operating under the power of attorney, the bank was making monthly statements of the condition of appellant's account, showing all the withdrawals with which appellant now seeks to charge the bank. These statements were at all times available to appellant.

Other pertinent facts are that, during the period Wilmer was acting under the power of attorney, other persons were authorized by appellant to draw on his account; that appellant was, from time to time, a large borrower from the bank. It appears that in 1924 he borrowed $24,000, and again in 1926 he borrowed $18,000.

As we view it, this evidence, taken as a whole, gives no foundation for the present claim that Wilmer all the while was juggling appellant's funds for the benefit of the bank. It may be that Wilmer was making loans for appellant that could not have been justified as bank loans. But this, appellant endowed him with the power to do.

So far as we can discern, there are only three items for which the bank might ever have been held liable. In 1920, before the power of attorney was executed, Wilmer withdrew two thousand dollars from appellant's account and loaned it to one Stone. Again in the same year, he loaned one thousand dollars from appellant's account to one Meuli. In 1919, he withdrew one hundred dollars from appellant's account and took up a note of one Blank to the bank in that amount. Of course, if these withdrawals were made without appellant's authority, they amounted in each

instance to a conversion. But the statute of limitations against the bank's liability had long run when the notes, upon which the present actions are predicated, were executed or indorsed.

Since the balance of the withdrawals upon which appellant relies as offsets were made by Wilmer under the authority vested in him by the power of attorney, there is no element upon which to establish a claim of conversion against the bank. The only theory upon which the bank could possibly be held would be: (1) That funds belonging to appellant went into its coffers; (2) through the fraudulent manipulations of Wilmer. Conceding the evidence sufficient to establish the latter, it is wholly insufficient to establish the former.

Appellant puts much reliance in the case of *McRae v. Farmers State Bank,* 178 Wash. 642, 35 P. (2d) 58. But we think that the power of attorney given by appellant to Wilmer, not as an officer of the bank but as an individual, makes a clear distinction between this case and.that. It was Wilmer, the individual, who handled appellant's money—not the bank.

Judgment affirmed.

MILLARD, C. J., BEALS, MAIN, and STEINERT, JJ., concur.